IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

   -v-                                                                            18-CR-55-LJV

JAMES A. CHAPMAN,
a/k/a Fatz Guy,
a/k/a Perverted Doe,

                Defendant.
_____

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S SENTENCING MEMORANDUM

**THE UNITED STATES OF AMERICA**, by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorney, respectfully files this response to the defendant's sentencing memorandum.

## PRELIMINARY STATEMENT

On May 9, 2019, the defendant appeared before this Court and pled guilty to Count 3 (production of child pornography) and Count 14 (possession of child pornography) of the Indictment. The Presentence Report ("PSR"), consistent with the plea agreement, determined that the defendant's advisory guideline range for the offenses of conviction was 480 months.[1] The plea agreement executed by the parties allowed the defendant to request a non-guideline

---

[1] However, unlike the plea agreement, the PSR calculated the defendant's criminal history category as a VI, however, because the defendant's total offense level is a level 43, his criminal history category has no bearing on the advisory guideline sentence.

sentence.  On March 13, 2020, the defendant filed a sealed sentencing memorandum requesting a non-guideline sentence of 15 years imprisonment, which is the mandatory minimum term of imprisonment for Count 3.  This memorandum is submitted in opposition to defendant's sealed request for a non-guideline sentence and in support of the government's contention that this Court should impose a guideline sentence of imprisonment of 480 months (360 months on Count 3, and 120 months on Count 14 to be served consecutively).

## DISCUSSION

**I.  THERE IS NO VALID BASIS FOR THIS COURT TO PERMANENTLY SEAL THE DEFENDANT'S SENTENCING MEMORANDUM**

The defendant moved to seal his sentencing memorandum on the basis that it contained "confidential and sensitive medical and mental health information."  *See* Dkt. #52.  Although the Court has since granted the defendant's motion to seal, *see* Dkt. #53, the government is opposed to such sealing and moves this Court to reconsider it prior Order.  Local Rule of Criminal Procedure 55(a) provides that "[e]xcept where restrictions are imposed by statute or rule, there is a presumption that Court documents are accessible to the public and that a substantial showing is necessary to restrict access."  Local Rule 55(a), available at:

www.nywd.uscourts.gov/sites/nywd/files/2021%20Criminal%20Local%20Rules%20FINAL%20with%20SIGNATURES%20%28rev%201-4-2021%29.pdf, last accessed July 12, 2021.  The defendant's motion sets forth no legal basis justifying the permanent sealing of his sentencing memorandum.

The defendant's motion also runs counter to the public's right of access to criminal proceedings. The First Amendment provides the public and press a qualified right to attend all portions of a criminal proceeding; from *voir dire* to sentencing. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980); *United States v. Alcantara*, 396 F.3d 189, 194-96 (2d Cir. 2005). On several occasions, the Supreme Court has discussed the public's right of access to criminal trials and has identified that this right flows from the major underlying purpose of the First Amendment of protecting "free discussion of governmental affairs." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (*quoting Mills v. Alabama*, 384 U.S. 214, 218 (1966)). In *Globe Newspaper Co.*, the Court highlighted that

> criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

*Globe Newspaper Co. v. Superior Court*, 457 U.S. at 606 (footnotes omitted).

Two years later, the Supreme Court expanded on this discussion, and noted

> [t]he open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*"). Identifying that some criminal acts "provoke public concern, even outrage and hostility;" the Supreme Court recognized that

> [w]hen the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected.

*Id.* at 509. The circumstances warranting a closure of criminal proceeding is "rare," and can only occur with "cause shown that outweighs the value of openness." *Id.* *See also Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986) ("*Press-Enterprise II*") (stating that "proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'") (*quoting Press-Enterprise I*, 464 U.S. at 510).

"Because the right of access to criminal proceedings is not absolute, it 'may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information.'" *United States v. Doe*, 63 F.3d 121, 127 (2d Cir. 1995) (*quoting Waller v. Georgia*, 467 U.S. 39, 45 (1984)). To overcome the presumption of openness and close a portion of a criminal proceeding, a District Court must find

> that the following four criteria have been met: (1) the party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) the trial court must make findings adequate to support the closure.

*United States v. Gomez*, 705 F.3d 68, 74 (2d Cir. 2013) (internal quotation marks omitted) (*quoting Waller v. Georgia*, 467 U.S. at 48)).

In the present case, the defendant has failed to establish an interest that overrides the right of the public and the press to completely open criminal proceedings. The interest the defendant seeks to protect through the instant motion is that certain information contained in the defendant's sentencing memorandum is "confidential." However, if the defendant is relying on the information contained in his sentencing memorandum to justify a non-guidelines sentence, the public has a right to know what that information is. The information underlying the defendant's sentencing request should not be permanently shielded from the public on a simple claim it is "confidential." To allow such permanent sealing would reject the teachings of the Supreme Court regarding the openness of criminal proceedings and ignore Local Rule 55(a). Therefore, the government is opposed to the defendant's request to seal, and moves the Court to publicly docket the defendant's sentencing memorandum.

II. **BASED ON THE FACTORS SET FORTH IN SECTION 3553, THIS COURT SHOULD CONCLUDE THAT A GUIDELINE SENTENCE OF IMPRISONMENT PROVIDES THE PROPER PUNISHMENT FOR THE OFFENSE OF CONVICTION**

The United States recognizes that since *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory rather than statutorily mandated. However, when imposing a sentence, the Court is required to consider the guidelines, but must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a). As noted by the Supreme Court, the guidelines have a "real and pervasive effect … on sentencing" and therefore, "are not only the starting point for most federal sentencing proceedings but also the

lodestar." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).  The United States contends that a sentence within the advisory guideline range is reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.  *See United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress .... It bears noting that the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider.").  The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  A court that imposes a sentence outside the applicable advisory guidelines range must do so on notice to the parties and must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.  18 U.S.C. § 3553(c).  Based on the § 3553(a) factors, as set forth below, the government respectfully submits that a guideline sentence of imprisonment is warranted.

### A. The Nature and Circumstances of the Offense Warrant a Substantial Sentence of Imprisonment

As set forth in the factual basis of the plea agreement and the PSR, the defendant's offenses of conviction involve the sexual exploitation of numerous minor females, which

essentially involved the defendant prostituting children for his own deviant sexual desires. Troubling to the government is that the defendant's victims were all vulnerable children, who were either addicted to drugs or impoverished, which the defendant knew and used to his advantage. For Victims 1 and 2, who were 16 and 14 years old, respectively, the defendant paid them the paltry sum of $60 each to engage in a three-way sexual encounter with him, at a time when the defendant weighed approximately 600 pounds and was 34-years old. The Facebook conversation recovered during the investigation leaves no doubt that the defendant was aware that Victims 1 and 2 were minors, and indeed, was concerned that the victims may try to blackmail him after the fact. After the defendant had sex with both Victim 1 and Victim 2, he refused to pay them until they posed naked on his bed so that he could take what could only be described as a sadistic trophy picture to document his first threesome experience. Following the defendant's rape of Victims 1 and 2, the disgust felt by Victim 2 was clear, as the first thing she wrote in her message to Victim 1 was "That shit made me sick man," to which Victim 1 responded "Same."

However, the trauma to Victims 1 and 2 did not end after the sexual encounter, as the investigation uncovered four instances of the defendant distributing the sadistic trophy picture to other Facebook users, one of whom was Victim 3, a 17-year-old minor female. Therefore, Victims 1 and 2 now must deal with the pain and embarrassment of knowing that other individuals, some of them likely sexual deviants just like the defendant, have seen them at their most vulnerable moment. In 2019, the New York Times documented the impact of the distribution of child pornographic images over the internet in a four-part series, which included a question and answer with two child abuse victims, which noted the following:

> Two sisters from the Midwest are among the untold number of survivors of child sexual abuse who say they are unable to escape their horrific experiences because of the internet.
>
> Millions of photos and videos of children being sexually abused exist on a wide range of platforms, from Dropbox to Facebook Messenger, for criminals around the world to see. An investigation by The New York Times found that the technology industry has consistently failed to take coordinated steps to shut down the illegal content.
>
> Because online predators sometimes stalk people in the photos and videos, the two sisters, now 17 and 21, do not discuss their experiences publicly for fear of being recognized. They agreed, however, to talk to The Times if they were not named. They are identified here by their first initials, F. and E.
> …
> What does it mean to you that pictures of you are still out there?
>
> E. It just sucks that it's still going on, because the pictures are still circulating. It's like another form of abuse. People would say: "It's just pictures. Who are they hurting?" No, that's so violating. If those were pictures of you, you would understand. It's not like a harmless thing because of that.
>
> F. It angers me more than upsets me. That stuff just really makes me mad that I've been through it and that so many people are still doing that stuff. It scares me for other kids because, you know, I'm more of a person where I get concerned for other people over myself. So it scares me. They have my pictures. They are out there. If you're looking at that, you're obviously out there looking at little girls. Eventually, you're going to want to act on it. And I just don't want anybody else to go through what I went through.

New York Times, *'If Those Were Pictures of You, You Would Understand'*, November 9, 2019, available at www.nytimes.com/2019/11/09/us/online-child-abuse.html. Therefore, although the defendant's photographing of Victims 1 and 2 involved a discreet act at one moment in time, that moment will have lasting consequences for Victim 1 and 2. Victim 3, who took and sent the defendant a picture of her genitalia at his urging, also must deal with the knowledge that the image she took was distributed by the defendant.

8

The importance to the defendant of the sadistic trophy picture he took of Victims 1 and 2 is apparent based on the fact that as of January 24, 2018, when the defendant was interviewed by the FBI at his residence, he still physically possessed the image on his personal LG cellular telephone that he had taken more than three years prior. Additionally, the defendant also had a copy of the sadistic trophy picture saved to his Facebook account, and two of his Google account. To a sexual deviant like the defendant, possession of this awful photograph appears to be the crowning achievement of his life.

Therefore, based on the nature and circumstances of the present offenses, which included the defendant's prostitution of minor females, the memorialization of his sexual abuse of the victims, and his circulation of child sexual abuse images for other to see, the government respectfully suggests that a guideline sentence of imprisonment is appropriate.

B. The History and Characteristics of the Defendant Warrant a Guideline Term of Incarceration

The history and characteristics of the defendant clearly distinguish this case from most other production of child pornography cases. Here, in addition to the disturbing conduct involving Victims 1 and 2, the defendant engaged in nearly identical conduct with other minor females who were 15 and 16 years old, which is documented in the PSR at paragraphs 81 to 90. The defendant's conduct included paying the children $50 to have sex with him, providing them marijuana, photographing the children nude, and then threatening to kill their families if they said anything. In at least one instance, a 15-year-old female reported that despite telling the defendant she did not want to have sex, the defendant forcibly raped her, and then photographed her nude. Therefore, it is clear to the government that the defendant is an

aggressive sexual predator who targets teenage females.  In a relatively short period, the defendant has already sexually exploited and permanently altered the lives of several minor females, and the government believes that if given the chance to do so again, the defendant would sexually exploit additional minor females.

In his sentencing memorandum, the defendant argues for leniency from this Court by claiming that he was the product of a broken and dysfunctional home.  However, as the PSR documents, none of the defendant's self-proclaimed instances of childhood abuse are verified by any other family members and remain unsubstantiated.  Rather, what the Court can use to gauge the defendant's early years is the psychological evaluation the defendant included as Exhibit B to his sentencing memorandum, which occurred when the defendant was 5 years old.  That report can be fairly read to document a young child of above-average intelligence who had already developed significant behavioral issues, to include what the reporter described as the "most intense efforts at attention- and affection-seeking that I have ever encountered in a child his age."  The reporter continued:

> He can be an extremely affectionate and endearing young man when he wants to be, and particularly when his needs and demands are readily met.  However, when denied his own way, he can very quickly revert to alarmingly cruel and aggressive expressions of hostility towards others.  These behaviors range from cruel verbal provocation to vulgar profanity to overt aggression including hitting, kicking, biting, and spitting.  The extent to which he would continue engaging in such aggressive behaviors not only after repeated warnings of negative consequences, but even after repeated consecutive imposition of negative consequences (e.g., time out and restriction of privileges) raises particular concern for a child with such strong intellectual ability.

Exhibit B to Defendant's Sentencing Memorandum, Bates #004.  Although the defendant argues that his behavior issues are the result of maltreatment in his early years, it is equally possible that the defendant was just a difficult child, who refused to conform his behavior to

normal standards.  Indeed, the defendant's lengthy criminal history support the government's belief that the defendant lived his life according to his own rules, regardless of whether it involved destroying property, stealing, selling marijuana, selling oxycontin, and selling unstamped/untaxed cigarettes.  The defendant has had numerous chances to change his behavior and lead a law-abiding life, and the defendant's current claim in his sentencing memorandum that he is now ready to lead an honorable life rings hollow to the government based on the conduct involved in this case and his past criminal record.

      The defendant also argues in his sentencing memorandum that he was forthright and honest with the FBI when they came to visit him in January of 2018.  However, the government disagrees with the defendant's characterization of his encounter with the FBI.  Indeed, as the PSR highlights, when the defendant began discussing his conduct with Victims 1 and 2, he steadfastly claimed that at the time of the sexual encounter, he believed the victims were 18 years old, and that it was only after the sexual activity that he learned they were minors.  That was a lie, as we know from the Facebook messages that the defendant was well aware of the victims' minor status prior to the sexual encounter, and for that lie, the defendant was charged in Count 7 with making a false statement to a Special Agent with the FBI.  Moreover, as outlined in paragraph 37 of the PSR, during the defendant's pre-polygraph interview on January 24, 2018, the defendant claimed that it was Victim 1 that sent him the sadistic trophy image following the sexual encounter.  That was a lie.  Additionally, following the polygraph examination, the defendant was told that he was reacting strongly to several of the questions, to which he initially provided information about Victim 3, and then denied engaging in any other sexual activity with any other minors and was uncooperative and

11

verbally aggressive with the polygraph examiner. On these facts, the government fails to see how becoming uncooperative and verbally aggressive can equate to the defendant's characterization that he "readily admitted" his conduct in the offenses of conviction.

As such, the history and characteristics of this defendant warrant a guideline term of incarceration.

### C. The Defendant's Conduct Has Negatively Impacted the Victims

In a child pornography case such as this one, the primary victims are the minors depicted in the images produced, distributed, and possessed by the defendant. *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001); *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir, 2001). As the *Sherman* Court noted, "child pornography directly victimizes the children portrayed by violating their right to privacy." *Id.* As the Court noted in *Shutic*, "children ... suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse a secret." *Shutic*, 274 F.3d at 1126. (citations omitted). Therefore, a sentence for the defendant's conduct must account for the impact his conduct had on the victims depicted in the images of sought from the victims. On February 27, 2013, the United States Sentencing Commission issued a Federal Child Pornography Offenses Report ("Report"), which reaffirmed that all child pornography offenses perpetuate the harm to the victims depicted in the images and fuels a market for the production of such images. *See* Report, ch. 12, p. 311-12 (available at www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses, last accessed July 12, 2021).

The defendant's actions directly harmed the lives of at least eight known victims as documented in the PSR.  Victim 1 has submitted a victim impact statement which included in part:

> I would like to be able to say that this incident did not have a lasting physical impact, but it has. I will forever have anxiety and self image issues. I have had issues with sexual situations, and with partners. that I am still working through. I will forever be the girl who sold herself in highschool for drug money. No I don't see myself that way but others still do.
> …
> Yes I was a drug addict and I sold myself for money to an adult, when I was a child. I wish that people would see me for me. Not a single incident that occurred 5 years ago.This incident has definitely affected me emotionally. I was bullied and harassed in highschool, because of this. It had gotten so bad that I changed schools. I still to this day have people shame me, and talk poorly about me. All because of one incredibly poor decision, A decision I should never have had the chance to make. I was a kid, when he was an adult. I didn't know better. I didn't care at that point in my life, but I was a kid. He was an adult there's no way he didn't know it was wrong. I spent so many nights crying just regretting what had happened. I still wish all the time that I could go back. I lost so many friends and some of my family judged me for a long time. I know they wanted to support me but of course they were disgusted. Rightfully so it was gross and should have never happened. I self harmed and hated myself for years. I have just in the last year started to regain confidence and find myself again. I will forever be disgusted in myself for making that decision.
> …
> He was alway very nice, and sweet when I was younger. I believe this is part of his allure. He's great at getting people to feel bad, and just as great at getting them to do things for him. I just hope for the courts to make the correct decision on this and not let him free. I think he deserves to be in jail for the damage he has caused to myself and so many other people.

In the impact statement submitted by Victim 3, she notes that she has "so much depression about whats going on," and that "I wish he would be in prison for a long while because I've been through rape by other people and nothing has happened so I would have more deprission if nothing happens to him."  Finally, one of the uncharged victims in this case has noted that the defendant's conduct has had an emotional impact on her, and that the defendant "should

13

not be able to be let out of prison. I'm scared that he will try again. Also, I'm scared that he will keep his promise about hurting my family for turning him in."

Therefore, based on the significant victimization that occurred in this case, a guideline sentence of 480 months would be a proper sentence to adequately punish the defendant and promote deterrence.

## **CONCLUSION**

For the foregoing reasons, the defendant should be sentenced to a guideline term of incarceration.

DATED:  Buffalo, New York, July 13, 2021.

JAMES P. KENNEDY, JR.
United States Attorney

BY:       ***S/ AARON J. MANGO***
          _____
          AARON J. MANGO
          Assistant U.S. Attorney
          United States Attorney's Office
          Western District of New York
          138 Delaware Avenue
          Buffalo, New York 14202
          (716) 843-5882
          aaron.mango@usdoj.gov