UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                            **18-CR-55-LJV**

     v.                                      **SENTENCING MEMORANDUM**

JAMES A. CHAPMAN,


            Defendant.
_____


## INTRODUCTION

James Chapman never "belonged" anywhere in his life, not even as a young child.  He has

been abused, abandoned, rejected, and hurt by nearly every person who was supposed to love

him.  He was not loved by his mother, nor his grandmother, instead he was repeatedly abused by

them.  And he was betrayed by a system that was supposed to protect him.  Each time the

"system" encountered James, there was recognition of the abuse and neglect he faced at home,

and yet, each time he was placed back in the same environment until the system became his

home.  Now, even James' body betrays him as he wages an everyday battle with a myriad of

medical conditions which are chronically debilitating. PSR ¶¶141-143, Dkt. No. 36.

Two questions lie at the heart of every sentencing. Why did the defendant commit the

crime; and will he do it again?  This memorandum attempts to answer both of those questions.

"Why did James commit his offense?" is largely explained by his horrific and traumatic

childhood.  Some of James' childhood abuse is memorialized in his letter to the Court attached

hereto as **Exhibit A,** and in his Presentence Investigation Report (PSR, Docket No. 36, ¶¶ 126-

140, 145-148).  Further evidence of his horrific childhood was documented in the available

medical and school records, excerpts of which are attached hereto for the Court's consideration at sentencing as follows:

**Exhibit B** – Jamestown School Record Excerpts (Bates # 1-24)

**Exhibit C** – Saint Vincent Record Excerpts (Bates # 25-50)

**Exhibit D** – Western New York Psychiatric Record Excerpts (Bates # 51-75)

**Exhibit E** – Baker Victory Record Excerpts (Bates # 76-88)

**Exhibit F** - Social Security Record Excerpts (Bates # 89-103)

**Exhibit G** – Chautauqua Department Mental Hygiene Record Excerpts (Bates # 104-05)

**Exhibit H** – UPMC Chautauqua Medical Record Excerpts (Bates # 106)

**Exhibit I** – Niagara County Jail Medical Record Excerpts (Bates # 107-110)

In addition, the likely lasting effects of James' tumultuous childhood are demonstrated in several studies that are referenced herein.

But James' sentence should not only account for the "why," it should also adequately account for the factors which indicated that James will not reoffend after he is released. Those factors include his genuine remorse, and his desire to engage in treatment.

Additionally, the sentence should recognize the disproportionate nature of the guidelines relative, insofar as they regularly calculate offenders in this circumstance at the statutory maximum without regard to significant differences in individual offenders. In James case, both the unique personal circumstances giving rise to the production offense, the minimal nature of the possession offense, and the overrepresentation of his criminal history all suggest that an overemphasis on the guideline calculation is not warranted.

This case represents the importance of this Court to utilize its discretion to impose appropriate sentences that are sufficient, but not greater than necessary. The Supreme Court has

long acknowledged that modern penal philosophy tailors punishments to not just fit a crime, but also to fit the offender. See generally *Williams v. New York*, 337 U.S. 241, 247-48 (1949). An important duty of any District Court Judge is to prevent injustices by the government in individual cases, See *United States v. Ingram*, 721 F.3d 35, 2013 WL 2666281, at *14 n.9 (2d Cir. June 14, 2013) (Calabresi, J. concurring).

James is aware of the harm he has caused as a result of his involvement in this offense. See Exhibit A.  He accepted full responsibility for his conduct as indicated by the fact that he pled guilty as charged to the highest count of the Indictment.  But, he is a defendant whose offense conduct and personal history and characteristics simply do not justify a forty (40) year sentence as calculated by the advisory Guidelines range. While James realizes that he must serve a very lengthy prison sentence for his conduct, a sentence that essentially equates to James serving the rest of his life in prison is undoubtedly more than necessary.

As important as it is for this Court to understand the person that Mr. Chapman is, it is equally important that the Court understand the person that Mr. Chapman is not.  James' case is the sort that begs close scrutiny.  Following that scrutiny, it is requested that the Court impose a sentence at the mandatory minimum, followed by a period of supervised release with a therapeutic component.  Here, a sentence below the guideline range is clearly warranted when contemplating the §3553(a) factors present in this case. There is substantial mitigation to warrant the imposition of the mandatory minimum sentence of 15 years. That sentence represents one that is sufficient, but not greater than necessary to meet the basic goals of sentencing including retribution, deterrence, incapacitation, and rehabilitation.

Sentencing is scheduled for April 3, 2020 at 1:00pm.

## NATURE OF THE OFFENSE

James Chapman has been in custody for almost two years. He stands before this Court for sentencing for violating 18 U.S.C. § 2251(a) and § 2252A(a)(5)(B). He admitted that over five years ago on or about November 24, 2014, he had sexual contact with two (2) minor victims in exchange for money and cigarettes. PSR ¶¶44-46, Dkt. No. 36. During the encounter, James took a photograph depicting the two (2) females from the neck down, completely nude, sitting on a mattress, one (1) of whom was exposing her breasts and genital area in a provocative manner. In addition, James admitted that on or about September or October of 2017, he arranged to give a 17-year-old female (hereinafter C.M.) a carton of cigarettes in exchange for a nude image of her. James provided C.M. with a carton of cigarettes and as a means of payment C.M.'s boyfriend sent him a nude image of C.M. In the photograph, C.M. was completely nude, exposing her genitalia and breasts in a sexually provocative manner. PSR ¶44, Dkt. No. 36.

Some important factors for this Court to consider regarding the offense conduct include that James was not in a position of trust vis-à-vis the victims; he was not related to any victim, he did not use force, he did not threaten them, he did engage in cyberstalking, nor did he misrepresent his identity to anyone. Without a doubt, the victims were minors, but the fact that James did not possess a large collection of child pornography images suggests that the age of the victims was not the driving force for the offense conduct.

To understand why this occurred, one need not look too far beyond James' personal circumstances at the time of the offense. It was James desire to have sexual relations with anyone willing, which drove the offense conduct here. He readily admitted to law enforcement that he felt he needed to pay for sex given his significant obesity. Weighing 480 pounds at the time of his arrest in 2018 (and a reported 600 pounds in 2016 as documented in Exhibit H, Bates 119), James was mainly confined to his home most of the day, and as a result, he unfortunately

sought companionship in inappropriate ways.  On January 24, 2018, when James was voluntarily interviewed by FBI agents at his residence in Jamestown, New York, he readily admitted to the sexual activity, and advised that he took a photograph of Victim 1 on his bed next to her friend.[1] During the interview, James also voluntarily showed agents the photograph of Victim 1 and Victim 2 stored on his LG telephone and stated that he also had the image stored in his Google accounts, jac9782@gmail.com and jacjac9782@gmail.com.


## ADVISORY GUIDELINE RANGE

Recognizing that his offense conduct was criminal, on May 9, 2019, James appeared before the Court, and pled guilty to one count of production of child pornography, and one count of possession of child pornography, pursuant to a written plea agreement.  Pursuant to paragraphs 10 thru 24 of the plea agreement, the parties agreed that after all Guidelines adjustments are made, James calculates at a total offense level of 45, and a Criminal History Category of IV.  After accounting for the applicable statutory maximum penalties, the defendant's sentencing range would be a term of imprisonment of 480 months (40 years), a fine range of $50,000 to $500,000, and period of supervised release of five (5) years to life. See Dkt. No. 33.  James reserved the right to bring to the attention of the Court all information deemed relevant to a determination of the proper sentence in this action.

The Presentence Report prepared August 2, 2019 concurs with the calculations the plea agreement insofar as the offense conduct calculations, see Dkt. No. 36, but increased James criminal history category from a IV to a VI.  According to the PSR (Docket No. 36, ¶¶47-

---

[1] Victim 1 was 16 years old at the time, and although Victim 2 was actually only 14, Victim 1 texted James that her friend was the same age as her.

80,103-105, 112), James' advisory guidelines range remains 480 months imprisonment with a statutory mandatory minimum sentence of 180 months.

## SENTENCING PROCEDURE

Again, punishment must fit not only the offense, but also the offender.  See generally *Williams v. New York*, 337 U.S. at 247-48.  While this Court must correctly calculate the Guidelines range in each case, it may not treat that range as mandatory.  *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009).  Rather, this range is "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall,* 552 U.S. at 49-50, 53-60.  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101; see also *United States v. Pepper*, 562 U.S. 476, 131 S. Ct. 1229, 1242-43-4 (2011). These goals are retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (2).

The importance of individualized sentencing is a central theme in federal criminal law. As the Supreme Court recognized in *Koon v. United States*, 518 U.S. 81, 113 (1996), "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue." Having greater familiarity with an individual defendant places the sentencing court in a superior position to the Sentencing Commission "to find facts and judge their import under § [3553(a)] in

each particular case." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotations omitted).

Several guideline enhancements that serve to generate longer sentences in sex offense cases, have come to be so commonly encountered that they essentially apply to the vast majority of offenders and fail to meaningfully distinguish among offenders in terms of their culpability and dangerousness.  Over the last decade courts have increasingly been concerned that many routine pornography enhancements undermine the principle of proportional sentencing.  Thus, the authority of this Court to disagree with a particular guideline as a matter of policy is a critical Supreme Court directive designed to ensure that the guidelines are truly advisory and constitutional.

Indeed, sentencing courts are free to disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).  However, in determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that the court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. See id. at 142 (where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

The § 3553(a) factors to be considered when imposing a sentence include:

1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

2)    the need for the sentence imposed -

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with the needed. . . training or . . . treatment in the most effective manner;

3)     the kinds of sentences available;

4)     the kinds of sentence and the sentencing range established for

(A)     the applicable category of offenses committed by the applicable category of defendant as set forth in the Guidelines . . .;

5)     any pertinent policy statement. . .[issued by the Sentencing Commission];

6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7)     the need to provide restitution to any victims of the offense.

Based on the truly advisory nature of the guidelines and the significant mitigation detailed herein, James respectfully requests that this Court consider all of the factors in 18 U.S.C. §3553(a) under the circumstances of this case and consider imposition of a sentence a the mandatory minimum with a period of supervised release that will provide James with the therapeutic components of mental health and sex offender treatment, as a sentence that is sufficient but not greater than necessary to meet the purposes of sentencing.

8

## ACCEPTANCE OF RESPONSIBILITY

Mr. Chapman immediately and readily accepted responsibility for his conduct when approached by law enforcement.  From the moment police interviewed him on January 24 2018, he readily admitted that he engaged in sexual intercourse with a 16-year-old female, hereinafter Victim 1, and Victim 1's friend, hereinafter Victim 2, in exchange for money and cigarettes. He also voluntarily advised that he took a photograph of Victim 1 completely nude, exposing her breasts and genital area lying on his bed next to her friend, who was also completely nude but did not have her genitals exposed in a lascivious manner. During the interview, Mr. Chapman freely showed agents the photograph of Victim 1 and Victim 2 stored on his LG telephone and stated that he also had the image stored in his Google accounts, jac9782@gmail.com and jacjac9782@gmail.com.

From the time of his initial appearance, throughout this case, he has never refuted or minimized his offense conduct.  His statements have been honest, reflective, and remorseful.  He not only understands the wrongfulness of his actions, but he fully recognizes that his severe mental health issues and abhorrently abusive childhood contributed to his conduct.  James was also open and candid at his presentence interview readily admitting to his offense conduct and describing his mental health issues.  PSR, ¶¶44-46, Dkt. No. 36.  During the interview, James adopted the factual basis of the Plea Agreement and affirmatively accepted responsibility.  He openly discussed the circumstances surrounding his involvement in the instant offense.  He also explained the reasoning behind his conduct, advising that he had paid adults in the past to engage in sexual intercourse with him, stating that, "no one ever wanted to have sex with a fat guy." Additionally, James further admitted to communicating with Victim 3 (17-year-old female) on or around April 7, 2017.   He advised that he requested and received a sexually explicit image of

Victim 3 after creating a group page "Are You Really A Freak."  James candidly revealed that he found himself communicating with the minor victims, as they seemed mature and had a genuine interest in him. He has never viewed any additional child pornography and has never specifically searched for child pornography via the Internet.  PSR ¶ 45, Dkt. No. 36

Throughout the entirety of the interview, James continually expressed sincere remorse for his conduct in the instant offense.  He explained, "I know what I did was wrong," stating that he is not accustomed to socializing.  James reported that to him, he was involved in friendships, which seemed mature and acceptable, admitting that he did not fully appreciate the age of his victims. As a result of having a social disconnect throughout his formative years, one caused by his traumatic childhood, James struggled to obtain and maintain meaningful adult intimate relationships.  However, James repeatedly apologized for his behavior, stating, "I don't like this [the situation]."  PSR ¶46.  Moreover, in his letter to the Court, James expresses his deep remorse for his conduct and recognizing that just because he was lonely, he was wrong to trade money for sex.

## JAMES' HISTORY OF CHILDHOOD TRAUMA, ABUSE AND NEGLECT

### "A Childhood of Trauma"

"Any society, any nation, is judged on the basis of how it treats its weakest members -- the last, the least, the littlest." ~Cardinal Roger Mahony, In a 1998 letter, *Creating a Culture of Life.*

A true measure of our character is how we treat the poor, the disfavored, the accused, the incarcerated and the condemned. Aristotle, Mahatma Gandhi, Pearl S. Buck, Hubert H. Humphrey, and Pope John Paul II, have all echoed this sentiment throughout the ages.  James is

poor, being unable to secure gainful employment the majority of his life.  James is disfavored because of his obesity.  James is now incarcerated as a result of his conduct. James is now forever condemned as a sex offender.  Since the age of three, James constitutes one the weakest members of our society.  Throughout his entire childhood, he was institutionalized, and prescribed medications with horrendous side-effects.  The abysmal systemic response to James' mental health issues trapped him in a destructive cycle of abuse and institutionalization, starting at age 3 and repeated until he was incarcerated.

James' life-long mental disabilities undoubtedly contributed to his criminal history as well as his conduct in this case.  Despite these challenges, James wishes to embark upon a very successful path of post-arrest rehabilitation.  He desperately wants to participate in mental health counseling and sex offender counseling so that he can forge a path forward.  See Exhibit A.

Many of us are blessed to have as their first memory a birthday celebration with friends and family, or a feeling of exhilaration on a playground's swing. James' earliest memory is of him being institutionalized and the unending infliction of abuse.  He was beaten.  He was bruised.  He was broken.  In his letter to the Court attached hereto as Exhibit A, James recounts how his father was never around and he passed away due to alcohol poisoning when James was seven.  Hurtfully, James expresses how his mother never wanted him and that she struggled with alcohol, marijuana, and opiate abuse, and although never formally diagnosed, he believes she suffered from bi-polar disorder. As a result, his mother sent James to live with his grandmother. She, in turn, severely beat him.  To hide the evidence of her beatings, she would immerse James in ice and cold water so he would not bruise.  His grandmother would lock him in his room, and when he figured out how to escape, she handcuffed him and locked him in the closet. When his grandmother became enraged she would beat him with firewood and lock him in the middle of

winter almost naked in the "fruit" cellar. If James had the unmitigated gall to miss the school

bus, he was forced to walk from Jamestown four towns over to Ashville while his grandmother

followed behind him, in her car.  To add insult to injury, he was sexually molested at the age of

nine (9).

At the age of twelve (12) after a particularly abusive episode with his mother hitting him

with pots and pans, James ran way.  During his presentence interview, James painfully narrated

the events of his traumatic childhood, and how with limited support and virtually no consistency

he bounced from various psychiatric and juvenile homes during his formative years. PSR ¶126-

140, Dkt. 36.

The only person we have been able to identify in James' life that showed him any love

and tenderness was his friend Donald Holbrook, "Uncle Don" as James called him.  Uncle Don

was the only positive influential figure in James' life.  James explained that although he was not

his biological uncle, Uncle Don played an integral role in his life before he was arrested.  PSR

¶131, Dkt. No. 36.   Mr. Hollbrook was disabled and resided in Jamestown, New York until his

death in May of 2019.  Uncle Don was a retired veteran and was paralyzed on the left side of his

body. Up until his arrest, James was Uncle Don's primary caretaker.  James explained that he

maintained a great friendship with Uncle Don over the years; however, he had been unable to

remain in regular contact with him as a result of his incarceration in the instant offense. PSR

¶143, Dkt. No. 36.  Uncle Don received social services and could only accept collect calls when

money was deposited early in the month.

Over the course of James pretrial incarceration, if Uncle Don stopped answering calls,

James became worried.  See Exhibit I.  James persistently attempted to check in on Uncle Don's

well-being.  Throughout the course of our representation, James continually requested that our

office check on Uncle Don.  He was very grateful when our investigator was in Jamestown and contacted the Jamestown Sheriff's Department to check on Uncle Don's wellbeing; they agreed to check.  Unfortunately, Uncle Don was no longer living at home, and had been purportedly moved to a house where James feared people were taking advantage of him.  From Niagara County Jail, James used what little money he had in his commissary to purchase postage and make phone calls to the Jamestown Police Department, Chautauqua County Senior Services and the Veterans Administration begging them to render assistance to Uncle Don.

In the end, Uncle Don appears to have been taken advantage of as James feared, and he died last May.  James was distraught with the news, but was thankful our office was able to confirm Uncle Don's passing.  The love, care and concern James demonstrated for his Uncle Don confirms his redeeming qualities and substantiates the need for this Court to provide him with a second chance at a rehabilitated life.

## JAMES' PHYSICAL AND MENTAL HEALTH ISSUES IN CHILDHOOD

Research has shown that stressors experienced in early life, might change the parts of developing children's brains responsible for learning, memory and the processing of stress and emotion. See University of Wisconsin-Madison, Early Life Stress Can Leave Lasting Impacts on the Brain.[2] See also Madeline B. Harms, et al., Instrumental learning and cognitive flexibility processes are impaired in children exposed to early life stress (Oct. 19, 2017) ("Put together, these research findings suggest that early adversity could affect how people learn to obtain

---

[2]     *Available at* https://www.biologicalpsychiatryjournal.com/article/S0006-3223(14)00351-5/fulltext *Summarized at* *https://news.wisc.edu/early-life-stress-can-leave-lasting-impacts-on-the-brain/* (last accessed March 13, 2020).

13

rewards in their lives. It's possible that stress disrupts the development of key brain regions that help people associate specific events or actions with positive or negative outcomes.").[3]

James struggled at an early age with mental health and physical issues.  James reports the abuse he suffered in his letter to the Court, but much of that information is also corroborated by extensive medical records collected in anticipation of sentencing.  While records from many providers were no longer available, those that still exist provide a sad accounting of James childhood.

"Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words, child abuse and neglect 'get under the skin' to have a profound and often lasting impact on development." Institute of Medicine & National Research Council, New Directions in Child Abuse and Neglect Research 154 (Anne Peterson et al. eds., 2013).[4]  The researchers continue, "Brain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward more problematic outcomes is impacted." *Id.*

James history of institutionalization suggests this to be true in his case.

---

[3]     *Available at* https://onlinelibrary.wiley.com/doi/full/10.1111/desc.12596
*Summarized at* https://theconversation.com/extreme-stress-during-childhood-can-hurt-social-learning-for-years-to-come-96884 (last accessed March 13, 2020).

[4]     *Available at*
https://www.ils.ny.gov/files/New%20Directions%20in%20Child%20Abuse%20and%20Neglect%20Research%20Petersen%20et%20al%202014.pdf

**Timeline and Highlights of Institutionalization, Behaviors and Abuse**

**Age 5** - Jamestown School records from May 2, 1986, (Exhibit B; Bates 1-7) reveal that when James was just 5 years old he was referred for an assessment as part of a competency evaluation conducted while he was hospitalized on the Child and Adolescent Psychiatric Unit. James was admitted to the inpatient unit for stabilization and evaluation due to his mother's complaint that he was beyond her disciplinary control, and he was posing a danger to family members.  It is reported that James was placed on Ritalin at the age of 3, but that his mother discontinued the Ritalin without consultation, though she denied it.

She expressed concern about his recent playing with matches, and he was believed to have been the cause of a previous house fire.  He was, at age 5, apparently exhibiting extremely aggressive behaviors towards his sisters.  James' biological father was then in jail for robbery and had been separated from his mother since James was 3.

His mother placed a great deal of emphasis on James' feelings about his father as possible precipitant of his serious emotional and behavior problems. (His father was an alcoholic as well as an extremely violent man whose physical abuse of James' sister resulted in her being placed in foster care for a period of time.)

However, the records also reveal that child welfare was involved in James' case was apparently due to his mother's abuse of children and being neglectful towards the children.  She admitted that she became so upset with James's destruction of property and stealing, that she feared at times she would lose her temper and harm him via "overly harsh spankings." James was diagnosed at that time with ADD with Hyperactivity, which was remarked to be associated with significant behavioral management difficulties and which probably predisposed

15

James from a very early age towards difficulties adjusting to structure and limits in his environment.

The more serious condition reflected in James' then behavioral disturbances was that of Conduct Disorder, Socialized Aggressive Type.  "Children with this disorder tend to repetitively and persistently violate age appropriate rules and adult expectations and show minimal concern for the basic rights of others.  In [James'] case, his stealing and aggressive behavior towards others are the primary features, along with his selfish insistence of having his own way regardless of the needs or rights of others."

It was remarked that James was "very young to receive such a severe diagnosis, which in itself is associated with a negative prognosis regarding high risk for later juvenile delinquency and possibly even criminal, antisocial personality tendencies as an adult.  It was noted that if James "can somehow be assisted in overcoming his oppositional tendencies, accepting limits of others and conforming to rules and expectations set by authority figures, then he may avoid the usual course of full blown conduct disorder, which he will develop *unless there is intense intervention immediately*."

A Report from the School Principal from later that same month, May 29, 1986 (Exhibit B, Bates 8-9), reveals that James was being withheld from Kindergarten, again at age 5, for inappropriate behavior.  The record confirms that James had been evaluated at St. Vincent's Health Center and was diagnosed as having a conduct disorder, socialized aggressive type, and an attention deficit disorder with hyperactivity.  A class for emotionally disturbed students was recommended.  After James returned to school from St. Vincent's, he refused to cooperate with the teacher and became aggressive. This occurred on two different occasions and it was then

decided James would be withheld from school.  He was involved in a preventive mental health program.  Importantly, some suspicion of abuse arose at that point.

The conclusions at that time a recommendation that he be considered by the Committee on the Handicapped for classification as emotionally disturbed and placement in a 1:12:1 class.  Based on his mother's reported difficulty controlling James at home it was the examiner's opinion "that James may require a more consistent, structured home situation and perhaps the Department of Social Services may consider an alternate situation, such as foster care."  (Later records indicate that he was in foster placement at one time.  See Exhibit C, 306-309).

**Age 7** - Records from March 15, 1988 at Saint Vincent Hospital (Exhibit C, Bates 25-26) show an admission for aggressive acting out behavior at both home and school.  His mother again reports that she is unable to manage him at home and it is revealed that in addition to the diagnosis for ADD with hyperactivity, he had an abnormal EEG on previous admission (later revealed to be indicative of a seizure disorder), and a history of an auto accident with a head injury and concussion in the past 4 years.

**Age 9 -** By the time James is 9 years old, the Saint Vincent Hospital Records (Exhibit C, Bates 27-30) reveal that he was admitted at the request of family and caseworker, because of concerns about aggressive, assaultive behavior.  James had been biting, kicking and hitting his siblings and his mother.  He had taken his sled and slid it into the street after being told not to do this and that it was dangerous and he apparently tried to choke himself with a rope.

This record notes "significant past history is that he had been physically and emotionally abused and neglected by the parents.  His mother had several complaints signed against her when he was younger."   James was then involved in a BOCE's program for socially and emotionally

disturbed children in Ashfield, NY.  The diagnostic impression noted a "history of early physical, emotional abuse and neglect."

One month later he was readmitted to Saint Vincent Hospital as requested by his mother and caseworker.  (Exhibit C, Bates 37-38).  The Psychiatric Evaluation from March 3, 1990, indicates that James was engaging in assaultive behavior, and also was trying to hurt himself by riding his sled into the street and trying to choke himself with a rope.  The Psychoeducational Summary (Exhibit C Bates 39-40) confirmed his previous admission from 1988, and this new admission for emotional illness. It notes some "self abuse and suicidal ideations."  James had been doing well in school, but his teacher left, and he became less compliant, more aggressive and his academics deteriorated.  He was again diagnosed with oppositional defiant disorder-mixed organic mental disorder; mixed developmental disorder and seizure disorder.  It was noted that the family was moving to Pennsylvania and that contacts would be made for a self-contained class for socially and emotionally disturbed.

**Age 10** - But, several months later in November 1990, now age 10, James was back at Saint Vincent Hospital (Exhibit C, Bates 41-43), again for aggressive acting out behavior.  He had low self-esteem.  He had tried to burn himself with a lighter and stated that he wished to kill himself.  It was noted that he carried the diagnosis of attention deficit disorder, with hyperactivity and had been treated with Ritalin in the past. That admission suggests that the "family is somewhat chaotic and dysfunctional; that his mother minimizes any problems and tends to maximize problems with James. Tries to blame everything on [James]. Admits to no other family struggles or dilemmas." It was recommended that there be family therapy.

Jamestown School records from June 1991 (Exhibit B, Bates 10-16) reveal that the social worker did not feel that James needed to be put in a state hospital facility, that "at most he needs

structured living or specialized foster care.  Discharge planning eventually boiled down to sending him home to live with his grandmother, noting that his mother never came for family treatment and continued to state she hoped he would not return home since she feared him and he reminded her of [his father].

**Age 12** – Jamestown School Records (Exhibit B, Bates 17, 19) reveal that James was then placed in a highly structured 1:6:1 classroom, and that he was very immature for his age. Again it is noted that there are "extremely poor family relationships," and that while he lived with his grandmother for much of the previous 2 years, he was then back with his mother.

In January of 1993, at the age of 12, James had his first admission to Western New York Psychiatric Center.  (Exhibit D, Bates 51-64).  He was not discharged until August 5, 1993; and, when he discharged, he was transferred to Hillside Children's Center's Residential Treatment Facility.  The WNY Psychiatric Records reveal that James suffered from possible/vague sexual abuse[5] and physical abuse noted by his maternal grandmother.  James reported being physically abused by his grandmother, and the mother reports that she has severely physically punished James via "spankings, etc."  The record notes that at age 9 or 10, CPS became involved, and that CPS was then involved again.  At that time James was noted to have moderate to severe learning disabilities plus his ADHD.   His final diagnosis shows psychosocial stressors of severe physical abuse – "predominately enduring circumstances." (Exhibit D, Bates 74).

**Ages 14 – 17** - In February 1994 his mother signed him out of Hillside Children's Center's Residential Treatment Facility "against medical advice."  James ran away from home in April 1994.  Later that year, in June he was re-admitted to WNY Children's Psychiatric Center.

---

[5] James suffered from sexual abuse when he was 9 years old, being raped by his baby sitter's boyfriend. PSR ¶148, and Exhibit A.

James was placed with the Division for Youth, Tryon Residential Center from September 1994 until May 2, 1995, at which time he was transferred to Baker Victory.  James was discharged from Baker Victory on March 10, 1997, and again placed in the Division for Youth at the Tyron Residential Youth Facility.  (Exhibit E, Bates 76-88).

It is during these latter placements that James criminal history began.  This should come as no surprise.  "Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words, child abuse and neglect 'get under the skin' to have a profound and often lasting impact on development." Institute of Medicine & National Research Council, New Directions in Child Abuse and Neglect Research 154 (Anne Peterson et al. eds., 2013).[6]  The researchers continue, "[b]rain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward more problematic outcomes is impacted." *Id.*

James aggressive behaviors and hyperactivity resolved in adulthood as evidenced by his non-violent record as he transitioned out of his teen years, and the fact that during the course of all of counsel's interactions with James during the pendency of this case, he has exhibited no aggressive behaviors whatsoever.

---

[6]        *Available at*
https://www.ils.ny.gov/files/New%20Directions%20in%20Child%20Abuse%20and%20Neglect%20Research%20Petersen%20et%20al%202014.pdf

## CATEGORY VI OVERREPRESENTS
## JAMES' CRIMINAL HISTORY UNDER §3553(a)

James fully recognizes that he is thirty-nine years old and spent has spent a substantial portion of his life institutionalized.  See Exhibit A. But James' criminal history is a result of the systemic failures to get him appropriate help in his youth.   The timeline of his institutionalizations above serves to explain why James' falls within Criminal History Category VI.  Looking at the emotional deficits unloved children carry into adulthood, it cannot be a surprise that James engaged in criminal conduct.  Humans do not just need love to thrive in infancy, but they also need it to develop optimally. Those whose emotional needs are not met in infancy, childhood, and adolescence — who are deprived of love, or caring and trusted adults  — develop coping mechanisms which, in the long term, prove to be maladaptive and get in the way of both their ability to sustain relationships and their general well-being.

The plea agreement anticipated a Criminal History Category of IV.  See Plea Agreement, ¶¶ 22 and 23 (Dkt. No.33).  However, the PSR calculated Mr. Chapman's Criminal History Category VI.  PSR¶¶92-110, (Dkt. No.36).   The increase in the criminal history scores results from the fact that Mr. Chapman's criminal history print out reflected that prosecution was declined for the 1999 conviction set forth at ¶95 of the PSR; and also because the parties had only assessed one criminal history point for the conviction set forth at ¶97 of the PSR.

As a result of these two convictions, James' criminal history score increases a total of four points, which in turn increases his Criminal History Category to VI.   Mr. Chapman objects to these increases insofar as they were not contemplated in the written agreement, and as set forth below combine to overstate his total criminal record.

In addition, an in-depth analysis of the Presentence Report prepared in this case supports the conclusion that James' Criminal History Category VI significantly over-represents the

seriousness of his criminal history.  U.S.S.G. § 4A1.3, in fact, recognizes that "[t]here may be cases where the Court concludes that a defendant's criminal history category over-represents the seriousness of a defendant's criminal history."  Taking all of the relevant factors into consideration, it is also extremely important to note that none of James prior criminal conduct involved a sex offense. The PSR assessed James with 14 criminal history points based upon his prior felony convictions as well as several misdemeanor convictions. An additional two points were added to his criminal history category [under Guidelines § 4A1.1(d)] for engaging in this offense conduct while under a conditional discharge sentence for untaxed cigarettes.  James' past criminal conduct does not truly warrant such a high placement.

### Six Points Criminal History Points for Convictions Over Twenty Years Ago

At the age of 18, James sustained a conviction for Unlawful Taking or Disposition, a 1st Degree misdemeanor.  See PSR ¶95.  The initial sentence of imprisonment was an indeterminate sentence of 1½ to no more than 2 years with credit for 50 days in custody and release to parole.  On April 19 2001, James' parole was revoked after he admitted to the charges set forth in ¶96.  The PSR assesses James Chapman three criminal history points for this conviction occurring twenty-one (21) years ago.   A 1st Degree misdemeanor[7] in Pennsylvania is what is considered a "wobbler," thereby increasing the look back period to fifteen years as opposed to ordinary misdemeanors which call for a look back of only ten years.

In addition, the PSR assesses another three points for a criminal conviction sustained at the age of 19 which occurred twenty years ago.  A combined six (6) criminal history points for these two twenty year old convictions are part of the overrepresentation of James' actual criminal history.

---

[7] The penalties for a 1st degree misdemeanor conviction include from 2.5 to 5 years in prison.

**Four Criminal History Points for Marijuana Felony and the sale of one OxyContin Pill**

Additionally, the PSR at ¶97 assesses two criminal history points for a felony marijuana conviction involving the sale of $120 worth of marijuana to an undercover officer. Similarly, the PSR at ¶98 assesses two points for the sale of a one OxyContin pill for $20 to an undercover officer. A total of four points assessed for these small quantities of drugs is equally over-representative.

**Five Points for Untaxed Cigarette Misdemeanor Convictions and**
**Committing Instant Offense While Under a Conditional Discharge**

The PSR at ¶¶100,101,102 assesses three criminal history points for three misdemeanor convictions for untaxed cigarettes occurring between the years of 2014-2017. An additional two points were added to his criminal history category [under Guidelines § 4A1.1(d)], for committing the instant offense while under a conditional discharge sentence for the 2017 offense. See PSR ¶104.

Again, five points for these three misdemeanor convictions, all occasioned by James' inability to obtain gainful employment, contribute to this total criminal history score being overrepresented by a Category VI.

Undoubtedly, James was trapped in a destructive cycle of institutionalization, incarceration and punishment. However, at each stage of his life, James' needs were unmet. He struggled to go to school, he struggled to be able to work, he struggled to sustain a stable life, things many of us take for granted.[8]  The Court should be cognizant not to over-emphasize James' criminal history at the expense of other § 3553 factors, as set out herein. Accordingly, James' criminal history score over-represented the true seriousness of his prior criminal conduct,

---

[8] Social Security records reflect that James was selling untaxed cigarettes for a sustained period of time because he was morbidly obese, and cannot feel pain. He described this conduct as safe because he only had to sit there and thus had no risk of injury. See Exhibit F.

and a non-guidelines sentence at the mandatory minimum best fulfills the purposes of sentencing as reflected in § 3553(a).

## INCARCERATION, TREATMENT, AND COLLATERAL CONSEQUENCES

While a period of incarceration is mandatory, the question is what length is necessary to achieve the goals of sentencing.  This Court must consider whether the sentence imposed will provide Mr. Chapman with "correctional treatment in the most effective manner."  A sentence of 180 months properly reflects this consideration.  Although a period of incarceration is justified and mandated here, rehabilitation is not best achieved through a lengthy sentence of imprisonment.  Even if this court were to sentence Mr. Chapman to the mandatory minimum of 180 months imprisonment, he will be approximately 50 years old at the time of his release. He will have spent every single day of his 40s and 50s behind bars.  If this Court sentences him to the advisory guideline range (40 years), he will be approximately 70 years old at the time of his release.  Given his tenuous health conditions, it is unlikely he would survive such a sentence.

As this Court knows, Mr. Chapman's sentence is not meant simply to punish him; ideally, a sentence of incarceration is meant to rehabilitate James – to offer him counseling, and mental health care that he has never received before.  Indeed, research shows that sentencing sex offenders to prison has "little, if any, impact on sexual and violent recidivism following release." K.L. Nunes et al., Incarceration and Recidivism among Sexual Offenders, 31 Law & Hum. Behav. 305 (2007)[9];  see also *Tapia v. United States*, 564 U.S. 319, 131 S.Ct. 2382, 2385-86 (2011) (confirming that sentencing courts may not impose or lengthen a term of incarceration for

---

[9] Available at http://www.philipfirestone.com/p30%20%20Prison%20and%20 Recidivism.pdf (last accessed March 13, 2020).

purposes of treatment and recognizing that "imprisonment is not an appropriate means of promoting correction and rehabilitation").

And, studies have shown and courts have found that the returns – that is, the sentencing goals – may not only be diminishing, but that in fact extended sentences of incarceration may serve to defeat many of the sentencing goals, including, perhaps the most important: rehabilitation. See, *e.g.*, *United States v. Rivera*, 281 F. Supp. 3d 269 (E.D.N.Y. 2017) ("[L]onger prison sentences were associated with a three percent *increase* in recidivism.") (emphasis added) (quoting Valerie Wright, Ph. D., *Deterrence in Criminal Justice*, The Sentencing Project, Nov. 2010, at 6).

James deeply wishes to engage in treatment.  James has never really received adequate treatment.  This is surprising considering that "[c]hildhood adversity is among the most potent risk factors for developing mood and anxiety disorders later in life." Anne Albrecht *et al*., Neurobiological Consequences of Juvenile Stress: A GABAergic Perspective on Risk and Resilience, 74 Neuroscience and Biobehavioral Reviews 21 (2017).[10]

Furthermore, James faces serious collateral consequences as he will need to register as a sex offender which will impact and restrict his employment and residential opportunities in the future, and he will need to abide by post-release conditions requiring sex offender counseling.  And that registration comes with additional consequences.  Since the development of sex offender registries, research has explored various facets of their implementation and effects, including harmful collateral consequences of registries on sex offenders.  Researchers have consistently found that sex offenders report registries have detrimental effects on their lives.[11]

---

[10] *Available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6003940/ (last accessed March 13, 2020).

[11] Burchfield, K. B., & Mingus, W. (2008).  Not in my neighborhood: Assessing

25

(See Burchfield & Mingus, 2008; Levenson & Cotter, 2005; Levenson, D'Amora, & Hern, 2007; Robbers, 2009). Lasher and McGrath (2012)[12] conducted a review of studies on the social and psychological impact of community notification on sex offenders.  Across these studies, 8 percent of all participants reported being physically assaulted, or injured, and 14 percent report having their property damaged; 44 percent reported being threatened, or harassed by neighbors (Lasher & McGrath, 2012).  Beyond criminal acts, between 40 percent and 60 percent of participants reported negative psychological consequences such as feeling lonely, isolated, embarrassed, and hopeless (Lasher& McGrath, 2012).

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  See, e.g., *United States v. Autery*, 555 F.3d 864, 875-76 (9th Cir. 2009) (acknowledging that defendant's probationary sentence also included his registration as a sex offender, travel restrictions, internet restrictions, therapy requirements, computer restrictions, and other negative consequences); *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 470, 474-75 (4th Cir. 2007) (affirming the district court's finding in child pornography possession case that the defendant

---

registered sex offenders' experiences with local social capital and social control. Criminal Justice and Behavior, 35(3), 356-374; Levenson, J. S., & Cotter, L. P. (2005). The effect of Megan`s Law on sex offender reintegration. Journal of Contemporary Criminal Justice, 21(1), 49-66; Levenson, J. S., D'Amora, D. A., & Hern, A. L.(2007). Megan's Law and its impact on community re-entry for sex offenders. Behavioral Sciences & the Law, 25(4), 587-602.

[12] Lasher, M. P., & McGrath, R. J. (2012). The impact of community notification on sex offender reintegration: A quantitative review of the research literature. International Journal of Offender Therapy and Comparative Criminology, 56(1), 6-28.

warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence." (Internal citations omitted)); see also *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming below-Guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a)  analysis," including incapacitation, punishment, and deterrence).

A sentence at the mandatory minimum adequately punishes Mr. Chapman, while also providing for a mechanism to allow him to get the treatment he needs to be successful.  A lengthier period of incarceration does not serve those goals.  Rather, a substantial period of supervised release can be imposed with appropriate special conditions of supervision.  Those conditions should include mental health counseling and sex offender treatment.

## NEED FOR REHABILITATION

While no one disputes that James deserves punishment and that the victims in this case deserves whatever semblance of closure is possible, the pertinent question is what are the returns of a sentence of incarceration beyond the mandatory minimum of 15 years?

James is aware of the harm he has caused as a result of his involvement in this offense. He accepted full responsibility for his conduct as indicated by the fact that he pled guilty as charged to the highest count of the Indictment. James Chapman is a defendant whose offense conduct simply does not justify a forty (40) year sentence which is the advisory Guideline range purposed by the government and the probation department. While James realizes that he must

serve a very lengthy prison sentence for his conduct, a sentence that essentially equates to James serving the rest of his life in prison is undoubtedly more than necessary. There are factors present pursuant to Title 18 U.S.C. § 3553(a) that provide for a sentence in this case of 15 years as a sentence that is more than sufficient in this case and is not greater than necessary to achieve the goals of federal sentencing.  Accordingly, for the reasons set forth below, James Chapman respectfully requests a fifteen (15) year sentence of incarceration, followed by a significant period of supervised release with an appropriate therapeutic component.

## THE NEED FOR ADEQUATE DETERRENCE

James recognizes he is facing a very lengthy prison sentence. When looking at the deterrent effect of such a sentence, certainly a 15 year term of imprisonment has a deterrent effort for almost anyone who have ever spent time in prison.  The defense recognizes that the Court must impose a lengthy prison term, and at a minimum of 15 years, followed by a minimum term of supervised release of five years up to life, and registration as a sex offender.  Essentially, James will be under Court supervision the remainder of his life. The Court will have the ability to impose substantial supervised release conditions that will serve as further deterrence. These aspects of supervision will greatly curtail James' freedom of movement and place great restrictions on him. The loss of freedom whether it be 15 years in prison or lifetime supervision provides a great deterrent effect for possible future offenders. In addition, the likelihood that James would re-offend is minimal. Again, Mr. Chapman realizes he must serve a lengthy prison sentence, but a sentence that would equate to the rest of his life is more than necessary to accomplish any deterrent effect in this case. Accordingly, Mr. Chapman submits that a mandatory minimum sentence of 15 years is sufficient but not greater than necessary to provide

28

for adequate deterrence as the Court's concerns for the protection of the community are

sufficiently served with a sentence of 15 years. The danger to the community can be further

limited by James being monitored through supervision and registration as a sex offender.

## THE NEED TO PROTECT THE PUBLIC

The current charges are certainly very serious. The impact James' conduct has upon the

Victims is not minimized. However, the question for this Court is whether there are safeguards

that can be put in place to insure that Mr. Chapman remains a law-abiding citizen once he is

released on supervision after serving a 15 year prison sentence. In lieu of what would otherwise

equates to a life sentence, the Court has the ability to impose a very lengthy prison term of 15

years, followed by supervised release for life to ensure that Mr. Chapman is fully monitored and

supervised the rest of his life.  Also, there are numerous requirements and conditions including

treatment requirements, which this Court can impose to further protect the public. Such

conditions by their very nature provide for a substantial impairment on the freedom of any

individual, including, where a person may live, who he may associate with, and limited access to

the internet, smart phone or computers, etc. A 15-year sentence followed by a period of

supervised release with conditions more than adequately provides for the protection of the public

in this case. Moreover, the required treatment aspects of any term of supervised release would be

in addition to the treatment that Mr. Chapman will receive while he is in prison. Such treatment

will provide the method for James to deal with his offense conduct, as well as his longstanding

mental health issues. Hence, a mandatory minimum sentence of 15 years is sufficient, but not

greater than necessary to provide for protection of the public.

As requested, the mandatory minimum sentence of 15 years would also promote respect for the law, see 18 U.S.C. § 3553(a)(2)(A).   A sentence of 15 years in prison is certainly a significant punishment. In addition, a sentence of 15 years would be sufficient to deter James from further criminal conduct.  Similarly, a sentence of 15 years would punish James while allowing for rehabilitation through sex offender counseling. As such, the facts of this case support a sentence below the life sentence advocated by the Government. The Court should therefore, impose a sentence of 15 years as a sentence that is sufficient, but not greater than necessary under 18 U.S.C. § 3553(a).

While James' crimes are indeed serious and necessitate severe punishment, with proper counseling and supervision, James can make different life choices. There is absolutely no reason to incarcerate him for the rest of his life. He deserves the opportunity to show that with proper treatment, he can change his life around. The aforementioned personal history and the circumstances surrounding James' physical and mental health deficits support a finding that the proposed advisory Guideline sentence of 40 years is higher than necessary to serve the goals of sentencing. With proper rehabilitation, he can be successfully treated and allowed to return to society with supervision. Hence, a sentence outside of life imprisonment which is the advisory Guideline range proposed by the Government is clearly warranted.

Neither the defendant, nor defense counsel makes the argument that these charges are not a very serious offense. Indeed the offense is extremely serious as is evidenced by the fact that James is facing a mandatory minimum sentence of fifteen years in prison. Indeed, Mr. Chapman does not dispute that he should be punished. He is truly remorseful and understands the impact his actions have had upon the Victims in this case. James fully accepted responsibility for his actions and was immediately forthcoming to law enforcement about the nature of his conduct

with the Victims in this case. (See Exhibit A)   A sentence of below the Guideline range proposed by the Government and Probation would still be a just sentence, because it would severely punish James, and would also acknowledge that both his psychological and emotional scarring contributed to his offense. To impose punishment within the Guideline range proposed by the Government would thwart the goal of making an imprisonment term sufficient but not greater than necessary. See 18 U.S.C. § 3553(a). The facts of this case support a sentence outside the proposed advisory range of 40 years. Therefore, it is respectfully requested that the Court impose a mandatory minimum sentence of 15 years imprisonment as a sentence that is sufficient but not greater than necessary under the circumstances.

The government will surely stress the need for James' sentence to reflect the seriousness of the offense, to provide punishment, and to protect the public. Those are laudable sentencing goals. At a bare minimum, however, James will be sentenced to 15 years in prison.  One-hundred-and-eighty months' imprisonment certainly provides a great deal of punishment. And, with a sentence such as this, the seriousness of the offense can hardly be questioned.

At the end of the day, James is a relatively young man.  However, his present physical condition is tenuous at best.  In addition to his obvious morbid obesity, he suffers from thyroid disease (hypothyroidism), often uncontrolled throughout his pretrial detention (see Exhibit I).   If this Court sentenced him to 40 years in prison, he would likely not survive.  It is thus in everyone's best interest – the public, James', and the victims' – to focus not on incapacitation but on rehabilitation. Indeed, "[p]erhaps to the surprise of some, victims overwhelmingly prefer criminal justice approaches that prioritize rehabilitation over punishment and strongly prefer investments in crime prevention and treatment to more spending on prisons and jails." Alliance

for Safety and Justice, Crime Survivors Speak: The First Ever National Survey of Victim's Views on Safety and Justice 4 (2016).[13] This study found:

1. "By a 2 to 1 margin, victims prefer that the criminal justice system focus more on rehabilitating people who commit crimes rather than punishing them."

2. "6 in 10 victims prefer shorter prison sentences and more spending on prevention and rehabilitation to prison sentences that keep people incarcerated for as long as possible."

3. "By a margin of 2 to 1, victims prefer increased investments in community supervision, such as probation and parole, over more investments in prisons and jails."

4. "By a margin of nearly 3 to 1, victims believe that prison makes people more likely to commit crimes than to rehabilitate them."

Further, the purpose of increasing the punishment for recidivists "reflects and furthers the goal of targeting recidivists because it relies on specific evidence that a defendant has not accepted or abided by the significance of the censure inherent in his or her previous criminal conviction." *United States v. Martino*, 294 F.3d 346, 351 (2d Cir. 2002). The focus is thus properly placed on a defendant's failure to "abide by the significance of the censure."

Indeed, James will be sentenced to a minimum of 15 years' incarceration. He will be on supervised release for at least five more years, and up to life. He will register as a sex offender under the Sex Offender Registration and Notification Act. If  Probation's supervised release condition recommendations are accepted, he will participate in a sex-offense specific treatment program and a mental health treatment program; he will be subject to randomized polygraph testing; any internet device he may own must be monitored by U.S. Probation; if anything

---

[13] *Available at* https://allianceforsafetyandjustice.org/wp-content/uploads/documents/Crime%20Survivors%20Speak%20Report.pdf

"suspicious" occurs on those devices, he must consent to and cooperate with "unannounced examinations" of any electronic device, including the search of "all data"; he will have to turn over any "personal and/or business financial information" to U.S. Probation; and he will not be allowed to have any contact with anyone under 18 years old.

## KINDS OF SENTENCES AVAILABLE

Count 1 requires a mandatory minimum sentence of 15 years and a maximum punishment of 30 years. Count 14 requires a no minimum sentence and a maximum of 10 years imprisonment.  There are many alternative sentences available to this Court other than what would equate to a lifetime of imprisonment. If Mr. Chapman is placed on supervised release, the Court has many additional remedies available to it to curtail his freedom of movement and to provide for the necessary rehabilitative mental health treatment he so desperately needs. Mr. Chapman submits that under his advisory guideline sentencing calculations set forth above, a mandatory minimum sentence of 15 years imprisonment followed by supervised release is a sentence that is more than sufficient and not greater than necessary under the facts and circumstance of this case.

Recognizing that James' liberty will be significantly restrained for at least the next 15 years and possibly forever, a longer sentence of incarceration imposed for many of the § 3553(a) factors – including  punishment, incapacitation, deterrence and protection of the public – becomes unnecessary.

## CONCLUSION

Mr. Chapman was fully forthcoming with law enforcement from the moment they first interviewed him on January 24, 2018 regarding their investigation on these charges. He voluntarily turned over his cellphone to the agents. He did not minimize the nature of his relationship with the victims, and he accepted full responsibility for his actions in this case. Since his arrest, Mr. Chapman has come to better understand the impact of his crime upon the victims, and he is truly remorseful for what he has put these victims through. He understands that he has to be punished.  James will have mental health and sex-offender treatment both inside of prison and after his release. In the words of the law, James can be rehabilitated.  When the § 3553(a) factors of the history and characteristics of James are fully considered, a sentence of no more than fifteen years is appropriate. Based on the above, in consideration of the § 3553(a) factors, we ask this Court to impose a below-Guideline sentence of 15 years with a 5 year term of supervised release with an appropriate lengthy and substantial therapeutic component.

**DATED**:               Buffalo, New York, March 13, 2020.

Respectfully submitted,

**/s/ MaryBeth Covert**
MaryBeth Covert
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
marybeth_covert@fd.org
Counsel for James A. Chapman

**TO:**  Aaron Mango
Assistant United States Attorney
Natalie B. Harrington
U.S. Probation Officer